## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:

                                        **CASE NO. 12-12603**

**DAVID K. CALETRI**

**ANGELA B. CALETRI**                           **SECTION "B"**

          **DEBTORS**                  **CHAPTER 7**

**WEATHERALL RADIATION ONCOLOGY,**
**A Louisiana Medical Corporation**

          **PLAINTIFF**

**VERSUS**                             **ADVERSARY NO.**
                                         **13-1026**

**DAVID K. CALETRI**

          **DEFENDANT**

### <u>MEMORANDUM OPINION</u>

This matter came before the court on October 21-22, 2013, as a trial on the complaint of

the plaintiff-creditor, Weatherall Radiation Oncology, a Louisiana Medical Corporation

("WRO"), against defendant-debtor David K. Caletri, M.D. ("Dr. Caletri").  WRO, in its

complaint, sought to have the debt owed by Dr. Caletri declared non-dischargeable pursuant to

11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6), and to prove that Dr. Caletri is not entitled to a

general discharge of his debts pursuant to 11 U.S.C. § 727(a)(2)(A), (a)(2)(B), (a)(3), (a)(5) and

(a)(6).  The controversy concerns Dr. Caletri's breach of a contract of employment with WRO,

violation of the non-competition contract provision, and a subsequent state court judgment for

$520,500.00 plus interest rendered in favor of WRO, and against Dr. Caletri.

1

I.   **Background Facts**

WRO, was founded by Dr. Thomas Weatherall ("Dr. Weatherall").[1]  WRO provided

radiation oncology services in Louisiana in Terrebonne, Lafourche, Jefferson, Orleans and St.

Tammany Parishes.  Dr. Weatherall had operated a successful, active radiation oncology practice

in Houma since 1960.[2]  In 1993, he hired Dr. Caletri to serve the city of Houma's radiation

oncology patients because of the need to have a radiation oncologist living in the Houma area. [3]

Dr. Caletri was to carry on the practice with WRO corporate approval and support.[4]  Dr. Caletri

worked for WRO for about ten years during which time Dr. Weatherall promoted Dr. Caletri as

the face of WRO for the Houma area.  Dr. Weatherall directed physicians in the area, with whom

he had done business for approximately thirty years, to refer their patients to Dr. Caletri for

oncological services.  Dr. Weatherall's actions gave Dr. Caletri unlimited access to WRO's pre-

existing referral sources and patient base that Dr. Weatherall had built up over the past forty

years. [5]

The underlying dispute arises out of an agreement between WRO and Dr. Caletri, executed

on August 1, 2001, designating Dr. Caletri as a financial partner in WRO.[6]  Pursuant to this

agreement, Dr. Caletri was to practice radiation oncology for WRO along with Drs. Weatherall,

Luis A. Linares, and any additional WRO physicians.[7]  The agreement also contained a covenant

not to compete.[8]  Dr. Caletri terminated his employment with WRO on January 1, 2003,[9] while

---

[1] Trial Transcript, Weatherall (10/21/13) 10:7 – 10:8.
[2] Trial Transcript, Weatherall (10/21/13) 10:7 - 10:10.
[3] Trial Transcript, Weatherall (10/21/13) 10:7 - 10:10.
[4] Trial Transcript, Weatherall (10/21/13) 10:7 - 10:10.
[5] Trial Transcript, Weatherall (10/22/13) 99:10 - 99:25.
[6] Trial Exhibit G.
[7] Trial Exhibit G.
[8] Trial Exhibit G.
[9] Trial Exhibit I (letter dated January 2, 2003, from Caletri's attorney, Craig Landry, regarding termination of the
agreement between WRO and Caletri, with Caletri's resignation being effective on January 1, 2003).  Trial Exhibit
H (fax from Terrebonne General Radiation Center to WRO of a letter from Caletri to Chairman of the Credential's

still owing radiation oncology services obligations to WRO under the agreement until June 30,

2003.[10]   In January 2003 Dr. Caletri began directly competing against WRO in Houma, in

violation of the agreement,[11] by continuing to treat and bill patients that were previously billed

by WRO and by treating and billing new patients.   Prior to Dr. Caletri's resignation and

subsequent competiton against WRO, there was no other radiation oncologist practicing in the

Houma area.   From January 2003 until June 2003, Dr. Caletri was self-employed.   In June 2003,

Dr. Caletri and another radiation oncologist, Dr. Raymond Clay Gould ("Dr. Gould"), formed

Radiation Oncology of the South, LLC ("ROS").   Drs. Caletri and Gould practiced together until

June 2011.[12]

In response to Dr. Caletri's departure from WRO, it filed suit and obtained a judgment after a

full trial on the merits against Dr. Caletri in the 32nd Judicial District Court for the Parish of

Terrebonne based on Dr. Caletri's breach of his employment contract with WRO and the

violation of the non-competition provision.[13]   The state court awarded five hundred twenty

thousand dollars ($520,000.00) plus legal interest from the date of judicial demand and expert

---

Committee, Chief of Staff of Terrebonne General Hospital, all medical staff officers, hospital administrators, etc. indicating Caletri's resignation and cease of coverage for WRO).
[10] Trial Exhibit G.  The term of the agreement was for one year and renewed automatically for successive one-year periods unless terminated.  The initial one-year term commenced July 1, 2001.  Absent advanced written notice of termination 60 days prior to the end of the term, the contract automatically renewed for an additional year.
[11] Trial Exhibit G.  Paragraph 8 of the Agreement provides as follows:

> 8. Non-competition.  Caletri, his successors, assigns, or professional corporations, will not during this term, nor for a period of two (2) years from the date of termination of this agreement, for any reason whatsoever, for cause or no cause, directly or indirectly, practice radiation oncology, or own, manage, operate, join, control, be employed by, or participate in the ownership, management, operation, or control of, or be connected in any manner with, any person or entity that competes with Weatherall in the provision of professional radiation oncology services in any Louisiana Parishes where Weatherall provides said services, specifically including the Parishes of Terrebonne, Lafourche, Jefferson, Orleans, and St. Tammany.

[12] Trial Transcript, Caletri, (10/21/13) 163:22 - 164:8 & 199: 1-2 (Dr. Caletri's testimony that his practice separated from Dr. Gould in May or June of 2011).
[13] Weatherall Radiation Oncology, a La. Med. Corp. v. David Caletri, Case No. 138488 (32nd Judicial District Court for the Parish of Terrebonne, La. 3/14/11).   (P-1), Trial Exhibit A.

fees of five hundred dollars ($500.00) to WRO.[14]  The trial judge's reasons for judgment was based on Dr. Caletri's failure to provide radiation oncology services to WRO's patients for the period of January 2, 2003, until June 30, 2003.[15]  That state district judge also found that Dr. Caletri violated the non-competition clause in the agreement.[16]  On appeal, the state First Circuit Court of Appeals affirmed the judgment of the lower court June 8, 2012.[17]

The judgment became executory before the appeal was finally resolved, and WRO filed and served a garnishment petition, notice of seizure, citation to garnishee and garnishment interrogatories on ROS and David Caletri, L.L.C., through their registered agent, Dr. Caletri, on October 27, 2011[18] to which no answer was filed by ROS or David Caletri, L.L.C.

On March 19, 2012, as a response to a rule for judgment pro confesso, the 32nd Judicial District Court for the Parish of Terrebonne rendered a judgment pro confesso and garnishment against ROS and David Caletri, L.L.C. for the full amount of the $520,000 judgment rendered against Dr. Caletri plus attorneys' fees and costs.[19]

Dr. Caletri and his wife Angela B. Caletri filed for Chapter 7 bankruptcy relief on August 27, 2012.[20]  WRO was listed as a non-priority, unsecured creditor in the debtors' schedules.  WRO filed this adversary proceeding on March 14, 2013 to seek the debt owed to WRO declared non-dischargeable, and to seek denial of the debtor's discharge.[21]

---

[14] (P-1), Trial Exhibit A.
[15] Trial Exhibit A.
[16] Trial Exhibit A.
[17] *Weatherall Radiation Oncology, a La. Med. Corp. v. Caletri*, 11-2394 (La. App. 1 Cir. 6/8/12) 2012 WL 2061460. (P-1), Trial Exhibit C.
[18] Trial Exhibit P.
[19] Trial Exhibit D.
[20] Case No. 12-12603 filed in the Bankruptcy Court for the Eastern District of Louisiana.
[21] (P-1).

Pursuant to Federal Rule of Bankruptcy Procedure 2004 Dr. Caletri was examined by WRO on January 15, 2013.[22]  In the order for examination[23] Dr. Caletri was instructed to produce a number of documents requested by WRO in its motion for examination.[24]  ROS, David Dr. Caletri, L.L.C., and PMCros, L.L.C. were also ordered to appear for examination and subpoenas duces tecum were issued to each of them to produce certain documents.[25]  The subpoenas were served on Dr. Caletri as registered agent for each entity.

Dr. Caletri appeared, was examined, provided certain documents, and promised to provide additional documents as an individual and as a representative of David Caletri, L.L.C. and ROS. Dr. Caletri, through his attorney, provided additional documents in response to subsequent discovery requests.[26]  Dr. Caletri then stated that he had no further documents that were responsive to the subpoenas duces tecum previously served on him.

## II.    **Legal Issues**

A central purpose of the Bankruptcy Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by pressure and discouragement of preexisting debt.[27]  The Code limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor.[28]  Discharge exceptions are to be construed in favor of the debtor and against the creditor, inasmuch as the aim of the Bankruptcy Code is to give the debtor a fresh start.[29]  WRO's complaint takes a scatter gun – or

---

[22] Bankruptcy No. 12-12603, (P-45).
[23] Bankruptcy No. 12-12603, (P-47).
[24] Bankruptcy No. 12-12603, (P-47), related documents: (P-45), Trial Exhibit A.
[25] Bankruptcy No. 12-12603, (P-49), (P-50), (P-51).
[26] Trial Exhibit E.
[27] *Grogan v. Garner*, 498 U.S. 279 (1991); *see generally* U.S. Bankruptcy Code, 11 U.S.C.A. § 101 et seq.
[28] *Id.*
[29] *Laughlin v. Nouveau Body and Tan, LLC*, 502 F.3d 417, 421 (5th Cir. 2010); *see also Matter of Miller*, 156 F.3d 598 (5th Cir. 1998).

as many creditors' counsel prefer to call it a belt and suspenders – approach by alleging that Dr.

Caletri's judgment debt to WRO is non-dischargeable under §§ 523(a)(2)(A), (a)(4) and (a)(6) of

the Bankruptcy Code, and that he should be denied a discharge of all his debts under §§

727(a)(2)(A), (a)(2)(B), (a)(3), (a)(5), and (a)(6)(A).  At the trial the court orally dismissed the

counts under §§ 523(a)(4), 727(a)(3) and 727(a)(6)(A).  The remaining counts are dealt with

herein.

### a.  11 U.S.C.A. § 523(a)(6)

Under § 523(a)(6) of the Bankruptcy Code, a debt arising from a "willful and malicious

injury by the debtor to another entity or to the property of another entity is not dischargeable."[30]

Although generally relating to torts and not contracts,[31] § 523(a)(6) may apply to a broad range

of conduct causing harm to people or property.  The United States Fifth Circuit Court of Appeals

has held, however,  that a breach of contract may involve an intentional or substantially certain

injury and thus fall under § 523(a)(6).[32] The creditor has the burden of proof to show

nondischargeability by a preponderance of evidence.[33]

---

[30] 11 U.S.C. § 523(a)(6).

[31] *Kawaauhau v. Geiger*, 523 U.S. at 61-62, 118 S.Ct. at 977, 140 L.Ed.2d 90 (1998) (noting that the language of Section 523(a)(6) emulates the definition of an intentional tort, which requires an actor to "intend the consequences of an act, not simply 'the act itself'" (citing *Restatement (Second) of Torts* § 8A, cmt. a (1964); *cf. In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003) *citing In re Miller*, 156 F.3d at 604 (5th Cir. 1998) (Despite similarities in the language, Section 523(a)(6) creates a narrower category of tortious conduct, noting, "Merely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful").

[32] *In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003); *see State of Tex. By & Through Bd. of Regents of U. of Tex. Sys. v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998)(debtor committed the tort of conversion by keeping professional fees instead of remitting them to his employer, the University of Texas, in violation of his employment contract); *Matter of Miller*, 156 F.3d 598, 606 (5th Cir. 1998)(judgment creditor brought adversary proceeding to obtain determination that state court judgment against Chapter 7 debtor for misappropriation of proprietary information or misuse of trade secrets was nondischargeable debt).

[33] *In re Keaty*, 397 F.3d 264 (5th Cir. 2005); *citing Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Applying the United States Supreme Court's pronouncement that § 523(a)(6) requires actual intent to cause injury.[34]  The Fifth Circuit has held that for a debt to be nondischargeable under § 523(a)(6), the debtor must have acted with "objective substantial certainty [of injury] or subjective motive [to injure]."[35]  Debts from intentional *acts* that cause unintended or unanticipated injuries are not "willful and malicious" within the meaning of § 523(a)(6).[36]  The court should look to the entire record to determine the wrongful character of the act.[37]  "Willful and malicious" injury is established when there exists either (1) an objective substantial certainty of harm arising from a deliberate or intentional action, or (2) there is a subjective motive to cause harm by a party taking a deliberate or intentional action.[38]  Substantial certainty must be adjudged at the time of each action or inaction.[39]

In a case where the harm was caused by a breach of contract, the debtor's breach of contract need not necessarily be accompanied by separate tortious conduct, in order for resulting debt to be excepted from discharge.[40]  Negligent or reckless conduct, however, is not willful and

---

[34] *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *see also In re Shcolnik*, 670 F.3d 624 (5th Cir. 2012).

[35] *Miller v. J.D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 603 (5th Cir. 1998); *In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003).

[36] *In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003) (labor union brought adversary proceeding to except debt from discharge for Chapter 7 debtor's "willful and malicious injury" in knowingly hiring nonunion labor in violation of terms of collective bargaining agreement ("CBA") and in continuing to hire such labor even following entry of agreed judgment requiring him to abide by terms of the CBA.  The dischargeability of debtor's two debts to the Union depended upon the intentional or certain nature of the injury debtor inflicted upon the Union when he breached the CBA and defied the Agreed Judgment.  The court held that: (1) an obligation arising from Chapter 7 debtor's knowing breach of a CBA in hiring nonunion workers for construction project would not be excepted from discharge as debt for debtor's "willful and malicious injury"; but (2) debt arising from Chapter 7 debtor's contempt of court, in disregarding agreed judgment requiring him to abide by terms of the CBA and to only hire union labor for construction projects, was nondischargeable).

[37] *Matter of Shuler*, 722 F.2d 1253, 1254-55 (5th Cir. 1984); *citing Brown v. Felsen*, 442 U.S. 127, 138-39, 99 S.Ct. 2205, 2213, 60 L.Ed.2d 767 (1979).

[38] *In re Miller*, 156 F.3d 598, 606 (5th Cir. 1998); *see generally In re Harwood*, 404 B.R. 366 (Bankr. E.D. Tex. 2009), *aff'd*, 427 B.R. 392 (E.D. Tex. 2010), *aff'd*, 637 F.3d 615 (5th Cir. 2011).

[39] *In re Harwood*, 404 B.R. 366 (Bankr. E.D. Tex. 2009), *aff'd*, 427 B.R. 392 (E.D. Tex. 2010), *aff'd*, 637 F.3d 615 (5th Cir. 2011).

[40] *In re Williams*, 337 F.3d 504 (5th Cir. 2003).

malicious for purposes of proving nondischargeability under §523(a)(6).[41]  Therefore, in the case before this court, the dischargeability of Dr. Caletri's debt to WRO depends upon the intentional or certain nature of the injury Dr. Caletri inflicted upon WRO when he breached his contract.

In this case Dr. Caletri testified he was motivated by a desire to have his own practice and had "worked too hard" to set up his own radiation oncology practice to continue working for WRO.  Although his testimony was rejected by the state court and contested by WRO, Dr. Caletri also testified that he wanted to provide better coverage to his patients which may be an additional reason for his resignation, although this reason was not sufficient to provide "cause" to rightfully violate his employment contract.  Although Dr. Caletri acted intentionally, he claims he did not intend to injure WRO.

The court finds, however, that Dr. Caletri intentionally took action that was substantially certain to cause injury to WRO.  When Dr. Caletri effectively resigned on January 1, 2003, he immediately started billing both old WRO patients and new patients for radiation oncology treatment services.  Dr. Weatherall had promoted Dr. Caletri as the predominant radiation oncologist for WRO in the Houma area and Dr. Caletri must have known that an immediate departure and essential takeover of the Houma radiation oncology field would cause financial injury to WRO.

Here it was substantially certain that WRO would suffer irreparable financial injury.  WRO was the only radiation oncology practice in the relatively small Houma market.  Dr. Caletri recruited at least twenty-five patients from WRO[42] to continue their repetitive, expensive treatment with Dr. Caletri.  WRO was effectively excluded from the Houma market because the market wasn't big enough to support two radiation oncologists.  Despite Dr. Caletri's testimony

---

[41] *Kawaauhau v. Geiger,* 523 U.S. 57, 59, 118 S.Ct. 974, 975-76, 140 L.Ed.2d 90 (1998).
[42] Trial Transcript, <u>Weatherall</u>, (10/21/13) 25:14 - 25:22.

that he billed only new patients and not pre-existing patients,[43] Dr. Caletri admitted that WRO never received any payments from Dr. Caletri for the patients that he took.[44]  Dr. Caletri also admitted he never informed WRO that it could bill the patients "if they so desired."[45]  In this case, an underlying purpose of the non-competition provision was to ensure that Dr. Caletri did not resign and continue to treat WRO's patients and treat new patients that would have been referred to WRO as the primary radiation oncologist in Houma.  Due to Dr. Caletri's actions, the breach of this agreement resulted in exactly what WRO intended to avoid by the agreement, the loss of previous and new patients for treatment, as well as the entire Houma practice.  Dr. Caletri deliberately recruited WRO's patients and their attendant payments at WRO's expense and his intentional actions were substantially certain to cause injury to WRO.

An injury to an entity or property may be a willful and malicious injury if it was wrongful, even in the absence of personal hatred, spite, or ill-will.[46]  Dr. Caletri, who admitted his acts were intentional, understood his contractual obligations to WRO and knowingly retained professional fees for his own benefit with the intent of depriving his employer of revenue.[47]  This caused a severe financial injury to WRO, the amount of which was fixed by the state court judgment.  Thus, Dr. Caletri's actions surrounding his breach of contract were substantially certain to cause injury to WRO and the debt is nondischargeable under Section 523(a)(6).

---

[43] Trial Transcript, <u>Caletri</u>, (10/21/13) 43:1 - 43:8.

[44] Trial Transcript, <u>Caletri</u> (10/21/13) 32:7 - 32:25.

[45] Trial Transcript, <u>Caletri</u> (10/21/13) 43:3 - 43:8.

[46] *In re Harwood*, 404 B.R. 366 (Bankr. E.D. Tex. 2009), *aff'd*, 427 B.R. 392 (E.D. Tex. 2010), *aff'd*, 637 F.3d 615 (5th Cir. 2011); *citing Matter of Miller*, 156 F.3d 598, 604-06 (5th Cir. 1998) (further determining that the standard for the existence of a "willful" injury under *Geiger* had subsumed the Circuit's former standard for determining "malicious" conduct under § 523(a)(6) ["without just cause or excuse"] and had eliminated any need to conduct a separate analysis on the malice element).

[47] *In re Williams*, 337 F.3d 504, 510 (5th Cir. 2003); *citing Texas v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998) (noting "[i]f a factfinder were to decide that [the debtor] knew of his obligations under the ... contract ... then [a factfinder] might also find that [the debtor] knowingly retained his professional fees in violation of the [contract], an act which he knew would necessarily cause the University's injury. This, in turn, could result in a finding of 'willful and malicious injury'").

In this case, WRO met the burden of proving a willful and malicious injury under § 523(a)(6).  As a result of Dr. Caletri's actions surrounding his breach of contract and violation of the non-competition agreement, Dr. Caletri intentionally acted in a way objectively, substantially certain to cause injury to WRO.   The subsequent judgment and damages award by the state court are not subject to discharge through bankruptcy pursuant to § 523(a)(6).

### b.  11 U.S.C.A. § 523(a)(2)(A)

One of the purposes of § 523(a)(2) is to ensure that the relief intended for honest debtors does not go to dishonest debtors.[48]  Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud."[49]  Distinction between "actual fraud" and "false pretenses" or "false representation" recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event as opposed to a representation regarding a past or existing fact.[50]

Actual fraud consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another- something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.[51]  The Fifth Circuit Court of Appeals held in *In re Acosta,* 406 F.3d 367 (5th Cir. 2005) that to establish a prima facie case of fraud under § 523(a)(2), a plaintiff must establish: (1) debtor made representations; (2) at the time of the representation, the debtor knew it to be false; (3) the debtor made the representation with the intent and purpose of deceiving the creditor; (4) the creditor relied on the

---

[48] *Matter of Miller*, 156 F.3d 598 (5th Cir. 1998).
[49] 11 U.S.C.A. § 523(a)(2)(A).
[50] *In re Harwood*, 404 B.R. 366 (Bankr. E.D. Tex. 2009), *aff'd*, 427 B.R. 392 (E.D. Tex. 2010), *aff'd*, 637 F.3d 615 (5th Cir. 2011).
[51] *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995) (citing 3 *Collier on Bankruptcy* ¶ 523.08[5], at 523–57 to58 (Lawrence P. King et al. eds., 15th ed. 1989).

representations; and (5) the creditor sustained losses as a proximate result of the representation.[52]
The debtor's fraud must result in a loss of property to the creditor.[53]  Frauds included are those
that involve moral turpitude or intentional wrong.[54]  Fraud implied in law, which may be
established without imputation of bad faith or immorality, is insufficient.[55]  Failure to perform a
mere promise is not sufficient to make a debt nondischargeable.[56]

In this case the fraud claim fails when the second *Acosta* element is examined.  There
was no clear showing by WRO that at the time the 2001 agreement was executed Dr. Caletri
knew that he did not intend to fulfill the contract.  The 2001 agreement was executed because Dr.
Caletri indicated to Dr. Weatherall that he wanted a larger share of the income.  The agreement
subsequently made Dr. Caletri a full financial partner in WRO which gave him the right to
participate fully in the total income of WRO.[57]  At trial Dr. Caletri admitted that by the summer
of 2002, he was considering leaving WRO, but there was no evidence to show that when he
executed the agreement in 2001, he knew that he intended to leave WRO.[58]

Although the remaining elements of § 523(a)(2)(A) may or may not have been satisfied
by Dr. Caletri's actions, the court need not analyze them in detail because the court finds that the
second element of the *Acosta* test has not been met.  The § 523(a)(2)(A) claim is dismissed.

   **c.   11 U.S.C.A. § 727(a)(2)(A)**

Because this court has held the debt owed to WRO is non-dischargeable under §
523(a)(6), it should not be necessary to analyze the two still viable counts under § 727.  But

---

[52] *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005), *citing*, *In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001).
[53] *In re Morrison*, 555 F.3d 473 (5th Cir. 2009).
[54] *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005); *citing In re Martin,* 963 F.2d 809, 813 (5th Cir.1992).
[55] *In re Acosta*, 406 F.3d 367 (5th Cir. 2005).
[56] *Id.*
[57] Trial Transcript, <u>Weatherall</u>, (10/21/13) 14:9 - 14:20 (giving Caletri the right to share in the income of all active radiation oncology practices of WRO at the time around Louisiana including Houma, Baptist, and Slidell).
[58] Trial Transcript, <u>Caletri</u>, (10/21/13) 41:19 - 41:21.

because of the insistence of WRO and the voluminous evidence offered at trial of § 727(a)(2) violations, the court will also examine with the remaining counts under the various subsections of § 727.[59]

    While the law favors discharges in bankruptcy, it will not ordinarily tolerate the debtor's intentional departure from honest business practices where there is a reasonable likelihood of prejudice.[60] The goal of Section 727(a)(2) is to prevent discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets.[61]

    Under § 727(a)(2)(A), the court shall grant the debtor a discharge, unless the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the debtor, within one year before the date of the filing of the petition.[62]

    In order to deny a discharge under Section 727(a)(2)(A), the plaintiff must show: (1) a transfer [or concealment] of property; (2) belonging to the debtor; (3) within one year of the filing of the petition; and (4) with the intent to hinder, delay, or defraud a creditor or officer of the estate.[63]

    At trial WRO proved that there is a glaring discrepancy in Dr. Caletri's bank account disclosures. The payments from insurance companies for Dr. Caletri's services are not accounted for in any bank account that Dr. Caletri disclosed. The majority of the deposits in the

---

[59]  After dealing with a number of § 523 and § 727 adversaries over a 20 year period on the bench, this court still does not understand why a creditor with a good case under § 523 for non-dischargeability of the specific debt owed to him will insist that a complete discharge of all the other debts owed by the debtor be denied to the debtor under § 727. What does the creditor gain by opening the gates for all of the other creditors to compete with the creditor/plaintiff for collectability of his non-dischargeable debt?

[60] *See generally* 11 U.S.C.A. § 101 et seq.

[61] *Matter of Chastant*, 873 F.2d 89, 90 (5th Cir. 1989).

[62] 11 U.S.C. § 727(a)(2)(A).

[63] *In re Pratt*, 411 F.3d 561, 565 (5th Cir. 2005), *citing In re Chastant*, 873 F.2d 89, 90 (5th Cir. 1989).

bank accounts that Dr. Caletri disclosed were deposits at regular intervals of exactly $4,000.00.

The bank account statements did not show the multiple insurance payments receivable, due, and

paid to Dr. Caletri for radiation oncology services.[64] These payments were the primary source of

Dr. Caletri's previously substantial income.[65]  Dr. Weatherall testified that he rarely, if ever,

received an insurance payment in a round amount during his 60 year history as a physician

receiving payments from insurance companies for services rendered.  Dr. Caletri also stated that

when insurance companies make payments, "you never get an even number."[66]  Dr. Weatherall

alleges that there must be an undisclosed account which directly received the insurance payments

which Dr. Caletri did not disclose.  However, Dr. Weatherall was unable to prove the existence

of such an account although it is the only plausible explanation for the location of the insurance

payments that are not accounted for.  Dr. Caletri admitted that insurance payments are not round

amounts, but he testified that the insurance payments were deposited into the account, despite

providing no evidence supporting any such deposits.  The court finds that Dr. Caletri's testimony

on this issue was evasive and was not credible.  Despite the heated contestation of this issue, the

only explanation offered regarding the whereabouts of the insurance payments that makes sense

is Dr. Weatherall's theory that the insurance payments were deposited into an account which Dr.

Caletri has not disclosed, and then some of that money was then transferred at regular intervals

and in the amount of $4,000 to the account that Dr. Caletri did disclose.  This reduced the assets

available to WRO and constitutes concealment of those assets.

---

[64] Trial Exhibit 54 (Only three deposits were non-round numbers); Trial Exhibit 54, p. 1 ( Deposit in the amount of $2,396.72 on 08/17/2012; Trial Exhibit 54, p. 25 (Deposit in the amount of $1,979.38 on 11/02/2010); Trial Exhibit 54, p. 48 (Deposit in the amount of $131,660.17 on 09/22/2008).
[65] Trial Transcript, Weatherall (10/22/13) 72:21 – 72:25 (Weatherall was paying Caletri over $400,000 a year directly related to services rendered and subsequent money generated by patient treatment).
[66] Trial Transcript, Caletri (10/21/13) 59:7 – 59:15.

Concealing debtor property includes conduct such as placing assets beyond the reach of creditors or withholding knowledge of the assets by failure or refusal to divulge information.[67] Concealment of assets can also occur through omission of information from the debtor's schedules.[68]

In this case, Dr. Caletri is withholding knowledge of his assets by failing and/or refusing to divulge relevant information regarding the insurance payment deposits.  In *In re Pratt*, 411 F.3d 561 (5th Cir. 2005) the debtor did not disclose a bank account in his bankruptcy filings. However, the court found it to be merely "troubling", but not material or intentional so as to except the debtor from discharge in bankruptcy because the account was entirely inactive for a year and the account had no money in it.[69]  In this case Dr. Caletri's bankruptcy schedules include a description of a checking account titled "Bank account" with a current value of $10.00.[70]  At trial Dr. Caletri testified that all accounts were disclosed, but he later admitted ownership of several other accounts that had not been disclosed pursuant to bankruptcy requirements or subpoenas from the plaintiff.[71]

The court finds Dr. Caletri is withholding information as revealed by his evasive trial testimony regarding the location of the insurance payments which is further evidence of concealment or transfer of his property.  When asked where the money was located Dr. Caletri claimed ignorance of insurance billings and payment procedure.  Dr. Caletri was previously a full financial partner at WRO, as such he had worked in radiation oncology thus receiving

---

[67] *In re Scott*, 172 F.3d 959 (7th Cir. 1999).
[68] *In re Scott*, 172 F.3d 959 (7th Cir. 1999).
[69] *In re Pratt*, 411 F.3d 561, 566 (5th Cir. 2005).
[70] Bankruptcy Case no. 12-12603 (E.D. La.), (P-6)  Schedule B – Personal Property.
[71] Trial Transcript, <u>Caletri</u> (10/21/13) 86:1 – 88: 16 (Caletri testimony regarding ownership of Orange account, Capital one account, David Caletri, MD, Inc., A Professional Medical Corporation account, Hibernia bank account, ING account); Trial Exhibit 46 (Capital One account); Orange checking account); Trial Exhibit 46 (David Caletri, LLC account); David Caletri, MD, LLC account; Synergy account for Radiation Oncology of the South.

14

insurance payments for approximately 20 years, as well as running his own radiation oncology

practice for a period.  Dr. Caletri has at least reasonable business knowledge of the payment

procedure.[72]  Dr. Caletri worked for WRO for approximately 10 years during which time he

effectively implemented billing services and had a working knowledge of how billing insurance

claims works.  Dr. Caletri worked almost daily during which time he was generating the

appropriate codes to affect billing.  Dr. Caletri was also WRO's agent, responsible for the

Houma practice, and was required by WRO and federal law to check and double check the

therapists and physicians who were also generating codes for payment in the office.[73]  Although

Dr. Caletri argues that he merely passed his code information to the billing clerk, this does not

excuse or explain the supposed lack of knowledge by a doctor who was involved in the billing

practices of both WRO and later his own business.  The evidence also demonstrated that Dr.

Caletri had an awareness of insurance payment procedure because he applied for his billing

number months prior to his resignation from WRO and once he resigned, he continued to use

WRO's Code Master computer program to calculate amounts to bill the insurance companies for

patient treatment.  Dr. Caletri's failure or refusal to divulge the relevant insurance payment

information shows intent to conceal in this case.

The property concealed or transferred belonged to the debtor.  Although Dr. Caletri

worked and billed his services through ROS, Dr. Caletri had direct access to his ROS accounts,

he was the sole member manager of ROS, and was able to withdraw funds from the account at

---

[72] Trial Transcript, Caletri (10/21/13) 63:15 – 64:21 (Caletri argues that Dr. Gould, his partner after his resignation from WRO, was also the accountant and ran the business-aspect of ROS; while Caletri's only duties were to see patients, circle codes to utilize in Code Master, give the information to Susie Guillot (billing clerk) and Dr. Gould, and the resulting money would be deposited into the ROS account.
[73] Trial Transcript, Weatherall (10/22/13) 71:14 – 72:15.

his sole discretion and whim.[74]  The insurance payments were his property and should have been accounted for in the bankruptcy proceedings.

WRO also proved that Dr. Calteri's concealment occurred within one year before the filing of the bankruptcy petition.  A plaintiff must prove not that the original transfer or concealment was fraudulent but that the debtor's continued concealment within one year of filing the petition was intended to hinder, delay, or defraud creditors.[75]  To prove concealment, a showing that the debtor retained an interest in the transferred property is required.[76]  Courts have found that under a literal reading of the language, the intent to hinder or delay creditors, even if not fraudulent, may be sufficient to warrant a denial of discharge.[77]

In this case, the garnishment interrogatories were properly served on Dr. Caletri on October 27, 2011.  The debtor was served with the garnishment petition, notice of seizure, citation to garnishee and garnishment interrogatories for the amount of the debt owed to WRO,[78] and a few days later, the ROS account showed a balance of $19,025.61.  Dr. Caletri was aware that WRO was attempting to collect money from him, but Dr. Caletri did not withhold any funds or make any payments to WRO.[79]  Dr. Caletri retained an interest in the property and he has continued to conceal property because the location of the insurance payments are still concealed. Dr. Caletri filed for bankruptcy relief on August 27, 2012; thus the court finds that he has taken action to avoid payment to WRO and to conceal his funds within one year of the filing of his bankruptcy petition.

---

[74] Trial Transcript, Caletri (10/21/13) 56:8 – 56:16.
[75] 11 U.S.C.A. § 727(a)(2)(A).
[76] *Matter of Perez*, 954 F.2d 1026, 1028-29 (5th Cir. 1992).
[77] *Id.*
[78] Trial Transcript, Trial Exhibit P.
[79] Trial Transcript, Caletri (10/21/13) 52:15-52:18; *see* Trial Exhibit 54.

Absent a specific intent to defraud creditors, a discharge should not be denied.[80]

Constructive intent is insufficient to deny discharge.[81]  Although actual intent is required,[82]  a

debtor is unlikely to testify that the intent was fraudulent.  Therefore, under § 727(a)(2)(A),

intent to defraud may be established by circumstantial evidence or by inferences drawn from a

course of conduct, and the court may deduce fraudulent intent from all the facts and

circumstances of the case.[83]  The plaintiff has the ultimate burden to prove, by clear and

convincing evidence, actual intent to hinder, delay, or defraud creditors.[84]  There are certain

"badges of fraud" that courts will consider evidencing actual intent to defraud under §

727(a)(2)(A):  (1) the lack of or inadequacy of consideration; (2) the family, friendship or close

associate relationship between the parties; (3) the retention of possession, benefit or use of the

property in question; (4) the financial condition of the party sought to be charged both before and

after the transaction in question; (5) the existence or cumulative effect of the pattern or series of

transactions or course of conduct after the incurring of debt, onset of financial difficulties, or

pendency or threat of suits by creditors; and (6) the general chronology of the events and

transactions under inquiry.[85]  Once the presumption of intent attaches, the burden shifts to the

debtor to demonstrate that he lacked fraudulent intent.[86]

In this case, there are several badges of fraud evidenced by Dr. Caletri's conduct.  Dr.

Caletri retained possession, benefit, and use of his bank accounts.  Dr. Caletri ignored the

garnishment issued by the state court for the amount of the state court final judgment[87] and he

---

[80] *Matter of Chastant*, 873 F.2d 89, 90-91 (5th Cir. 1989).
[81] *Matter of Chastant*, 873 F.2d 89, 90-91 (5th Cir. 1989); *citing In re Glaser*, 49 B.R. 1015 (Bankr.S.D.N.Y.1985).
[82] *Matter of Chastant*, 873 F.2d 89, 90-91 (5th Cir. 1989); *citing In re Glaser*, 49 B.R. 1015 (Bankr.S.D.N.Y.1985).
[83] *In re Pratt*, 411 F.3d 561 (5th Cir. 2005).
[84] *See Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177 (5th Cir.1992); *Hibernia Nat. Bank v. Perez*, 124 B.R. 704, 708 (E.D. La. 1991) *aff'd sub nom. Matter of Perez*, 954 F.2d 1026 (5th Cir. 1992).
[85] *In re Dennis*, 330 F.3d 696 (5th Cir. 2003); *citing In re Schmit*, 71 B.R. 587, 590 (Bankr,D.Minn.1987).
[86] *In re Pratt*, 411 F.3d 561, 566 (5th Cir. 2005).
[87] (P-1), Trial Exhibit D.

did not withhold any funds to satisfy his debt to WRO.[88]  Dr. Caletri had direct access to his

ROS accounts, he was the sole member manager of ROS, and was able to withdraw funds from

the account at his sole discretion and whim.[89]  There is also a pattern of transactions after the

final state court judgment was rendered during which time the insurance payments are not

accounted for.  These badges of fraud evidence actual intent to defraud and WRO has met its

burden.

    The presumption of fraudulent intent has attached and the burden shifted to Dr. Caletri to

demonstrate that he lacked fraudulent intent.  He did not meet this burden because he did not

provide any new, relevant information regarding the location of the funds.  At his Rule 2004

examination, he stated that he did not know where the insurance payments for services provided

in 2011 are located, but stated the possibility exists that the payments went into a Synergy

account in his name.[90]  No further documents were produced for the Synergy bank account.[91]

Dr. Caletri was unable to explain satisfactorily the discrepancy and did not provide any further

documentation.  Therefore he did not meet his burden to prove that he lacked fraudulent intent in

transferring or concealing his assets.

    Dr. Caletri concealed his property within one year before filing the bankruptcy petition

and did so with the intent to hinder, delay or defraud.  Although courts are hesitant to deny a

discharge of bankruptcy to a debtor, the debtor in this case was in bad faith and intended to

decrease the assets of the estate available to settle debts with creditors.  The property transferred

or concealed was material because it was money and/or accounts receivable which resulted in a

substantial deprivation to WRO.  The discharge in bankruptcy should be denied.

---

[88] Trial Transcript, <u>Caletri</u> (10/21/13) 52:15 – 52:18.
[89] Trial Transcript, <u>Caletri</u> (10/21/13) 56:8 – 56:16.
[90] Trial Transcript, <u>Caletri</u> (10/21/13) 53:11 – 53:25.
[91] Trial Transcript, <u>Caletri</u> (10/21/13) 53:11 – 53:25.

### d.  11 U.S.C.A. § 727(a)(2)(B)

Under 11 U.S.C. § 727(a)(2)(B):

> The court shall grant the debtor a discharge, unless – the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed – property of the estate, after the date of the filing of the petition.[92]

To sustain an objection in order to deny a discharge under Section 727(a)(2)(B), the plaintiff must show: (1) a transfer of property; (2) belonging to the debtor; (3) after the filing of the petition; and (4) with the intent to hinder, delay, or defraud a creditor or officer of the estate.[93]

Under § 727(a)(2)(B), the same elements to deny a discharge under § 727(a)(2)(A) apply, with the notable difference being the time period which runs *after* the filing of bankruptcy.  In the *Matter of Perez*, the bankruptcy court's opinion relied on the existence of a pre-marital agreement between the Perezes, which established a separate property arrangement.[94] Given this arrangement, the court found that over 85% of a tax refund was attributable to income earned by Perez at a time when his wife earned little or no income, and therefore constituted his separate property.[95]  The court further found that Perez was knowledgeable enough about the separate property arrangement to know that his wife was not entitled to 50% of the tax refund check.[96] Based on the circumstantial evidence before it, the bankruptcy court concluded that Perez had transferred property of the debtor  with the intent to, if not defraud his creditors, at least hinder or delay their discovery of and access to certain assets.[97]

---

[92] 11 U.S.C. § 727(a)(2)(B).
[93] *In re Dennis*, 330 F.3d 696 (5th Cir. 2003); *Matter of Chastant*, 873 F.2d 89, 90 (5th Cir. 1989); *citing In re Reed*, 18 B.R. 462 (Bankr.E.D.Tenn.1982).
[94] *Matter of Perez*, 954 F.2d 1026 (5th Cir. 1992).
[95] *Matter of Perez*, 954 F.2d 1026, 1028 (5th Cir. 1992).
[96] *Matter of Perez*, 954 F.2d 1026, 1028 (5th Cir. 1992).
[97] *Matter of Perez*, 954 F.2d 1026, 1028 (5th Cir. 1992).

In this case, Dr. Caletri's continued concealment after filing the bankruptcy petition was intended to hinder, delay, or defraud creditors. Dr. Caletri never disclosed the account information which was responsive to the subpoenas by WRO. Dr. Caletri also did not clearly explain the discrepancy in his trial testimony and instead claimed ignorance. Therefore the debtor continued to conceal property from his creditors, particularly WRO, after the filing of bankruptcy.

Because there was a concealment of property, belonging to the debtor, continuing after the filing of the petition, with the intent to hinder, delay, or defraud WRO, Dr. Caletri should be denied a discharge from bankruptcy under § 727(a)(2)(B).

### e. **11 U.S.C.A. § 727(a)(5)**

Under § 727(a)(5), the court shall grant the debtor a discharge, unless the debtor has failed to explain satisfactorily, before determination of denial of discharge, any loss of assets or deficiency of assets to meet the debtor's liabilities.[98] Section 727(a)(5) includes any unexplained disappearance or shortage of assets.[99]

Section 727(a)(5) does not require the element of intent that is required for Section 727(a)(2). A plaintiff is thus not required to and need not plead intent with the particularity required for allegations of fraud, but must still identify particular assets which have been lost. The debtor must explain the losses or deficiencies in such manner as to convince the court of good faith and businesslike conduct.[100]

In this case, because the elements for denial of discharge of bankruptcy have been satisfied pursuant to Sections 727(a)(2)(A) and 727(a)(2)(B), no further analysis is necessary

---

[98] 11 U.S.C. § 727(a)(5).
[99] *Id.*
[100] 3 *Collier on Bankruptcy* ¶ 727.

under the lesser standard of Section 727(a)(5).  Dr. Caletri was unable to explain the

disappearance of insurance payments and the shortage of assets that were rightfully due and

payable to WRO pursuant to the state court final judgment.  Dr. Caletri breached the

employment contract with WRO and the non-compete provision.  That breach along with his

diversion of payments due WRO and the unfair advantage he obtained at WRO's expense, are all

a pattern of conduct convincing the court that he has not explained the loss or deficiency of

assets satisfactorily.  Dr. Caletri also did not prove businesslike conduct because his argument

was that he had no knowledge of the financial affairs of his company, which is not reasonable

businesslike conduct.  Because Dr. Caletri did not explain satisfactorily the loss of assets or

prove businesslike conduct, WRO has proved a discharge in bankruptcy should not be granted

pursuant to § 727(a)(5).

## III.  **Conclusion**

Pursuant to § 523(a)(6) of the Bankruptcy Code, Dr. Caletri's debt owed to WRO is excepted

from discharge in bankruptcy, and the bankruptcy court denies discharge to Dr. Caletri for five

hundred twenty thousand dollars ($520,000.00) plus legal interest from the date of judicial

demand and expert fees of five hundred dollars ($500.00), pursuant to the state court final

judgment.  This court also denies a discharge in bankruptcy entirely pursuant to §§ 727(a)(2)(A),

(a)(2)(B), and (a)(5).  A separate judgment will be entered in accordance with this memorandum

opinion.

New Orleans, Louisiana, September 10, 2014.

Jerry A. Brown
U.S. Bankruptcy Judge